UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

FRANCIS BANKINS,

Defendant

Criminal Action No. 18-213 (CKK)

**MEMORANDUM OPINION**
(April 12, 2019)

In this criminal action, Defendant Francis Bankins is charged with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year in violation of 18 U.S.C. § 922(g)(1). Defendant has moved to suppress as evidence any and all tangible physical evidence seized by law enforcement officers on June 11, 2018. Defendant argues that such evidence was seized in violation of the Fourth Amendment. Specifically, Defendant moves to suppress the recovery of a loaded firearm which was found in his right pocket during the allegedly unconstitutional search. Accordingly, the Court must determine whether or not the loaded firearm seized from Defendant was seized in violation of the Fourth Amendment. If such evidence was unconstitutionally seized, the it must be suppressed.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a

---

[1] The Court's consideration has focused on the following documents:
- Def.'s Mot. to Suppress Tangible Physical Evidence and Incorporated Memorandum of Points and Authorities ("Def.'s Mot."), ECF No. 12;
- Gov.'s Opp'n to Def.'s Mot. to Suppress Tangible Evidence ("Gov.'s Opp'n"), ECF No. 13;
- Gov.'s Ex. 1, body-worn camera video DVD/CD of MPD Officer Brock Vigil;
- Gov.'s Ex. 2, photo of Def. on scene;
- Gov.'s Ex. 3, photo of gun inside Def.'s right jacket pocket on scene;
- Gov.'s Ex. 4, photo of gun taken out of Def.'s right jacket pocket;

whole, the Court DENIES Defendant's Motion to Suppress. The Court concludes that the Fourth Amendment was not violated when a law enforcement officer seized the loaded firearm from Defendant because the officer conducting the search had a reasonable articulable suspicion that Defendant was armed and dangerous.

## I. FINDINGS OF FACT

The Court held an evidentiary hearing on Defendant's motion to suppress on April 4, 2019. The Court has considered the evidence presented during the hearing. In doing so, the Court considered the demeanor and behavior of the witness on the stand, the witness's manner of testifying, whether the witness impressed the Court as truthful, whether the witness impressed the Court as having an accurate memory and recollection, whether the witness had any motive for not telling the truth, whether the witness had a full opportunity to observe the matters about which he testified, and whether the witness had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case. The Court also considered the reasonableness or unreasonableness and the probability or improbability of the testimony of the witness in determining whether to accept it as true and accurate, as well as whether the testimony was contradicted or supported by other credible evidence. The Court has also considered the pleadings, the footage from officers' body-worn cameras, and the entire record in this case.

The Court credits the testimony of the only witness, Officer Brock Vigil, as follows.

---

- Gov.'s Ex. 5, photo of barrel of gun showing serial number and .357 magnum;
- Def.'s Ex. 1, same as Gov.'s Ex. 1;
- Def.'s Ex., 2, body-worn camera video DVD/CD of MPD Officer James Love; and
- Def.'s Ex., 3, body-worn camera video DVD/CD of MPD Officer Travis Collins.

The Court makes the following findings of fact. The Court will first make findings of fact that are relevant to the Defendant's motion and undisputed and/or uncontroverted by any evidence, and then make findings as to facts that are relevant and disputed or controverted by some evidence.

**A. The Undisputed or Uncontroverted Relevant Evidence**

The only witness at the evidentiary hearing, Officer Vigil, has worked for the Metropolitan Police Department for just under 17 years. April 4, 2019 Hr'g Tr. 8: 15. For approximately three years he has been assigned to the narcotics enforcement unit which primarily focuses on street-level undercover drug operations. *Id.* at 8: 17-25.

On June 11, 2018, Officer Vigil was on duty, driving in an unmarked law enforcement vehicle with his partner Officer Joseph Harkins. *Id.* at 10: 3-4. Officer Vigil was wearing a body-worn camera located at the lower-part of the center of his chest, which he activated when conducting official business. *Id.* at 10: 16-17, 12: 1-3. Because the body-worn camera focuses only straight ahead and is lower than Officer Vigil's sight-line, the camera does not capture everything that Officer Vigil sees. *Id.* at 103: 7-19. His fellow officers were also wearing body-worn cameras. *Id.* at 12: 6-8.

At approximately 5:00 p.m., Officer Vigil and Officer Harkins were called to assist at the 3100 block of Naylor Road Southeast in the District of Columbia. *Id.* at 12: 16-19. Another police vehicle, which was in front of Officer Vigil's vehicle, was operated by Officer Dominique Tyson, with Officers Travis Collins and James Love accompanying him. *Id.* at 12: 21-24. Officer Vigil observed Officer Tyson stop his vehicle and activate its emergency lights. *Id.* at 13: 1-4. So, Officer Vigil and Officer Harkins also stopped their vehicle and activated their emergency

3

lights. *Id.* at 13: 5-7. Officer Vigil was notified that Officer Tyson had stopped a vehicle for a window tint violation. *Id.* at 13: 12. Prior to exiting the vehicle, Officer Vigil activated his body-worn camera. *Id.* at 14: 5-8.

When Officer Vigil exited his vehicle, he approached the passenger's side of the stopped vehicle. Defendant was in the front seat on the passenger side. *Id.* at 14: 15-17. Officer Vigil observed Officer Tyson, who had initiated the stop, interacting with Defendant. *Id.* at 14: 17-19. Officer Tyson asked Defendant to step out of the vehicle. *Id.* at 14: 23-25.

Despite some initial reluctance, Defendant eventually exited the vehicle. *Id.* at 15: 8-11. At this time, Officer Vigil was standing a foot or two back from the passenger-side door. *Id.* at 15: 12-16.

Upon stepping out of the vehicle, Defendant was wearing a long, dark jacket. The length of the jacket was approximately to Defendant's knees and was zipped up. *Id.* at 92: 13. The jacket had large zippered pockets with vertical openings which were located on the left and right sides of the jacket. *See* Gov.'s Ex. 2. In the back of Defendant's jacket, there was a split positioned vertically from the bottom of the jacket up to the lower part of Defendant's back. April 4, 2019 Hr'g Tr. 26: 23-25.

After Defendant stepped out of the car, he dropped his identification card. *Id.* at 16: 14-15. Defendant bent down to retrieve his card. *Id.* After getting his card, Defendant stood back up. *Id.* at 16: 23. Officer Tyson directed Defendant to step back, maybe a foot or two, towards the rear of the car closer to where Officer Vigil was standing. *Id.* at 16: 24-25. At this time, Officer Vigil asked Defendant if he had a firearm and Defendant replied that he did not. *Id.* at 17: 8-9.

The parties dispute what Officer Vigil observed after Defendant stepped out of the vehicle. Accordingly, Officer Vigil's observations will be discussed below in the section on disputed or controverted evidence. However, the parties agree that, after asking Defendant if he had a firearm, Officer Vigil patted-down Defendant, finding what Officer Vigil believed to be a firearm in Defendant's right pocket. *Id.* at 20: 9-12. Officer Vigil immediately handcuffed Defendant and an officer recovered the loaded firearm from Defendant's pocket. *Id.* at 20: 14-19. The recovered loaded firearm was a .357, which is heavier than most guns because it is made out of solid metal and is big-barreled. *Id.* at 20: 23-25; *see also* Gov.'s Exs. 4-5.

## B. The Disputed or Controverted Relevant Evidence

During the evidentiary hearing, Defendant disputed Officer Vigil's testimony relating to what he observed after Defendant exited the vehicle. As evidence substantiating Officer Vigil's testimony, the Government submitted footage from Officer Vigil's body-worn camera. *See* Gov.'s Ex. 1. As evidence disputing Officer Vigil's testimony, Defendant also submitted that same footage from Officer Vigil's body-worn camera as well as two video clips from the body-worn cameras of other officers at the scene, Officer Love and Officer Collins. *See* Def.'s Exs. 1, 2, and 3. Defendant produced no other evidence disputing Officer Vigil's claims.

The Court will proceed by recounting Officer Vigil's testimony relating to his observations of Defendant after Defendant exited the car. The Court will then determine whether the video evidence provided by both the Government and Defendant supports or contradicts Officer Vigil's testimony.

Officer Vigil testified that, when Defendant stepped out of the car, he "could see that the right side of [Defendant's] jacket, that front pocket area, was weighted. And it was sagging lower

5

than the left side." *Id.* at 15: 21-23. He elaborated that when Defendant stepped out of the vehicle the right side of the jacket "drops down, heavy to that side, so the jacket's on a tilt leaning right." *Id.* at 26: 3-5. According to Officer Vigil, based on his experience, this observation immediately caused him to be concerned that Defendant had a firearm in his jacket. *Id.* at 16: 11.

During the hearing, Defendant argued that Officer Vigil could not have seen Defendant's pocket-area when Defendant exited the car because Officer Vigil's view was obscured by another officer at the scene, Officer Love. *Id.* at 46: 24-25. Officer Vigil responded that "Officer Love was in front of me, but he wasn't directly in front of me. He was slightly towards the sidewalk. He was moving in different directions. But he wasn't standing directly between us." *Id.* at 105: 24-106: 2.

Looking at the footage from Officer Vigil's body-worn camera, the Court agrees with Officer Vigil that he would have been able to observe Defendant after Defendant exited the car. While Officer Vigil's view of Defendant may have been temporarily partially obscured by Officer Love, Officer Love quickly moved to the side so that Officer Vigil had an unobstructed view of Defendant. Gov.'s Ex. 1, 3:08. Moreover, even when Officer Love was standing directly in front of Officer Vigil, Officer Vigil would still have been able to see the majority of Defendant's jacket. *Id.* Officer Love's arm was at a ninety-degree angle with his hand on his hip. As such, Defendant could have seen through the hole between Officer Love's arm and torso as well as around the outside of Officer Love's arm. *Id.*

Defendant also argued that the body-worn camera footage showed that Defendant's right pocket did not "dip" as Officer Vigil claimed that it did. April 4, 2019 Hr'g Tr. 52: 12-13. Again, watching the footage from Officer Vigil's body-worn camera, the Court finds that the right side

6

of Defendant's jacket does appear to be heavier than the left side. This is seen by the fact that the right side of Defendant's jacket falls straight down to his knees while the left side appears puffier. Gov.'s Ex. 1, 3:09. At a minimum, the Court finds that the video does not contradict Officer Vigil's testimony that, when Defendant stepped out of the car, the right side of his jacket appeared weighted. Accordingly, the Court credits this portion of Officer Vigil's testimony.

During the hearing, Officer Vigil also testified that, when Defendant bent down to pick up his identification card, Officer Vigil could see that "there was a hard object in there. I thought it to be a firearm." April 4, 2019 Hr'g Tr. 16: 20-21. Officer Vigil further testified that, when Defendant bent down, "that right side is leaning significantly further – lower than that left side of the jacket. It's kind of pulling the jacket to the right." *Id.* at 26: 19-22. Due to the weight in Defendant's right pocket, Officer Vigil observed that the split in the back of Defendant's jacket was more pronounced to the right. *Id.* at 27: 1-4.

Again, during the hearing, Defendant argued that Officer Vigil's view of Defendant would have been obscured by Officer Love. *Id.* at 47: 12-14. The Court has already addressed this argument, and further finds that by the time that Defendant bent down to pick up his card, Officer Love was no longer standing between Officer Vigil and Defendant. Gov.'s Ex. 1, 3:08.

Based on footage from Officer Collins's body-worn camera, Defendant further argued that Officer Vigil was not looking at Defendant when Defendant bent down to get his identification card. Instead, Defendant claimed that Officer Vigil's head was turned toward the driver-side of the car. April 4, 2019 Hr'g Tr. 96: 20-97: 7. Watching the footage from Officer Collin's body-worn camera, the Court finds that Officer Vigil was consistently observing Defendant during the relevant time-period. *See generally* Def.'s Ex. 3. While Defendant was

7

exiting the vehicle, Officer Vigil's head briefly turned away from Defendant and towards the driver-side of the vehicle. *Id.* at 0:05. However, Officer Vigil's head remained turned away from Defendant for less than a second. *Id.* Such a brief distraction would not have prevented Officer Vigil from observing Defendant while he bent down to retrieve his card.

Moreover, watching the footage from Officer Vigil's body-worn camera, the Court finds support for Officer Vigil's testimony. When Defendant bent down to pick up his card, his jacket appears to be pulled towards the right. Gov.'s Ex. 1, 3:12. And, when Defendant stood back up, his jacket quickly fell back down towards his knees on the right side, while remaining puffier on the left side. *Id.* at 3:16. Accordingly, the Court credits this portion of Officer Vigil's testimony.

Further supporting his suspicion that Defendant possessed a firearm, Officer Vigil testified that, when Defendant stepped back on Officer Tyson's orders, he "thought it to be a little unnatural, because he comes kind of like in a stiff motion back up towards me." April 4, 2019 Hr'g Tr. 17: 4-6. During the hearing, Defendant offered no argument against this statement. And, watching the provided footage, the Court finds that the evidence does not contradict this statement. Accordingly, the Court credits this portion of Officer Vigil's testimony.

Finally, when Officer Vigil asked Defendant if he had any weapons on him, Officer Vigil testified that Defendant's right arm "kind of drops towards – slightly towards that area of the pocket." *Id.* at 17: 10-11.

At the hearing, Defendant argued that the video footage from Officer Vigil's body-worn camera did not reflect Defendant's arm moving towards his right pocket. *Id.* at 62: 7-9. Reviewing all footage provided, there is no vantage point by means of which the Court could adequately determine whether or not Defendant's arm moved towards his right pocket after

8

Officer Vigil asked him if he had a gun. As such, the Court finds that the provided evidence neither conclusively establishes that Defendant's arm did move towards his right pocket nor that Defendant's arm did not move towards his right pocket. As Defendant has introduced no other evidence which would contradict this testimony, and the Court has no reason to doubt Officer Vigil's credibility on this point, the Court will credit this portion of Officer Vigil's testimony.

Based on these observations, Officer Vigil testified that he was concerned for "the other officers on the scene, for myself and for the Defendant as well and just everybody that was there. For safety reasons, you know. Firearms are very dangerous." *Id.* at 19: 6-9. Due to these concerns, Officer Vigil testified that he decided to conduct a pat-down of Defendant's right pocket.

The parties also dispute the method by which this pat-down took place. Again, the Court will proceed by recounting Officer Vigil's testimony relating to his pat-down of Defendant. The Court will then determine whether the video evidence supports or contradicts Officer Vigil's testimony.

Officer Vigil testified that "at this point, I'm focused directly on that pocket. Nothing else. So I immediately went to that pocket and I picked up that side of the jacket, which I saw that heavy object, which I believed to be a firearm. I picked the jacket up and reaffirmed it was heavy, consistent with a firearm, and then grabbed the firearm, which I immediately recognized to be a handgun." *Id.* at 20: 6-12. Officer Vigil reiterated that he "first lifted the pocket" that he believed had the gun in it. *Id.* at 27: 25-28: 1. He stated that he "went right to it." *Id.* at 28: 14.

During the hearing, Defendant argued that Officer Vigil did not initially go to the right pocket. Instead, based on footage from the body-worn cameras of Officers Vigil and Love,

9

Defendant argued that Officer Vigil lifted up the jacket to check the waistband and tapped the outside of the left pocket before searching the right pocket and finding the loaded firearm. *Id.* at 49: 1-4; 79: 9-11. Officer Vigil denied this and reaffirmed that he was solely interested in the right pocket. He testified that he grabbed Defendant's jacket with both hands and pulled the jacket up on the right side in order to "see the object, the heavy object, slightly bounce." *Id.* at 71: 17-18.

None of the videos provided present an ideal angle for determining the exact location of Officer Vigil's hands when searching Defendant. However, after watching all videos multiple times, the Court concludes that the videos corroborate Officer Vigil's testimony. To begin the search, Officer Vigil's left hand reaches for the outermost right side of Defendant's jacket. Gov.'s Ex. 1, 3:24; Gov.'s Ex. 2, 0:21. At the same time, Officer Vigil's right hand reaches towards the center of Defendant's jacket. *Id.* Officer Vigil then lifts both hands at the same time so that Defendant's right pocket is lifted and hanging down freely. Gov.'s Ex. 1, 3:25; Gov.'s Ex. 2, 0:22. While the right pocket is freely hanging down, it appears that it is weighted down by something. *Id.* Officer Vigil then moves both hands down Defendant's right-side pocket area, feeling the exterior of the pocket. Gov.'s Ex. 1, 3:26; Gov.'s Ex. 2, 0:23. It then appears that Officer Vigil feels the loaded firearm in Defendant's pocket because he quickly handcuffs him, and an officer later removes the loaded handgun from that pocket. Accordingly, the Court finds that the video evidence corroborates this portion of Officer Vigil's testimony, and the Court credits that testimony. Although memory may be malleable, in this case, body-worn camera footage supports the relevant portions of Officer Vigil's testimony.

## II. DISCUSSION

Defendant argues that the tangible physical evidence seized by law enforcement from Defendant's body on June 11, 2018 was obtained in violation of the Fourth Amendment. As such, Defendant argues that the evidence should be suppressed. The Court disagrees and finds that the evidence was not seized unconstitutionally.

"Time and again" the Supreme Court "has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (internal quotation marks omitted). As is relevant here, one of those exceptions occurs when officers conduct a "*Terry* search." Under *Terry v. Ohio*, 392 U.S. 1 (1968), during a properly justified stop on the street, if a law enforcement officer has a reasonable articulable suspicion that "that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," then that officer may conduct a limited search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24. In order for a *Terry* search to be justified, the circumstances at the time of the search and seizure must "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 22 (internal quotation marks omitted).

Here, the parties agree that the officers engaged in a properly justified stop based on the fact that the vehicle in which Defendant was a passenger had unlawfully tinted windows. *See* April 4, 2019 Hr'g Tr. at 112: 12 ("I'm not questioning that it was a lawful stop."); *Id.* at 101: 16-23 (explaining that the vehicle in which Defendant was a passenger had windows which

measured 6% light transmittance, well below the 70% and 50% required for front and rear windows respectively). Defendant also does not dispute that the officers were justified in asking him to exit the vehicle. *See Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (explaining that officers may order the passenger of a lawfully stopped vehicle to exit the vehicle). Accordingly, the only issue before the Court is whether or not Officer Vigil had a reasonable articulable suspicion that Defendant was dangerous to the officers or to others on the scene in order to justify the search of Defendant's right pocket. *See Terry*, 392 U.S. at 24.

The Court concludes that Officer Vigil did have a reasonable articulable suspicion for conducting his search of the right pocket, making the search lawful and the evidence obtained admissible. Officer Vigil testified that he had multiple reasons for suspecting that Defendant was in possession of a firearm. First, Officer Vigil testified that, when Defendant exited the vehicle, the right side of Defendant's jacket was sagging down lower than the left side and appeared to be weighted. Based on Officer Vigil's 17 years of experience in law enforcement, he became concerned that there was a firearm in Defendant's right pocket. April 4, 2019 Hr'g Tr. 15: 21-23; 26: 3-5; 16:11. Officer Vigil then testified that he became more suspicious when Defendant bent down to pick up his identification card. Officer Vigil observed what he believed to be a hard object in Defendant's right pocket which pulled Defendant's jacket to the right as he bent down. Additionally, upon bending down, the split in the back of Defendant's jacket was more pronounced on the right side than on the left, indicating something heavy in Defendant's right pocket. *Id.* at 16: 20-21; 26: 19-22; 27: 1-4. When Officer Tyson asked Defendant to take a step back, Officer Vigil further observed that Defendant moved back in a stiff, unnatural way. *Id.* at 17: 4-6. And, when Officer Vigil asked Defendant if he had a firearm, Officer Vigil observed

that Defendant's hand dropped down towards his right pocket. *Id.* at 17: 10-11; *see United States v. Bullock*, 510 F.3d 342, 348 (D.C. Cir. 2007) (finding reasonable suspicion for a *Terry* search of suspect stopped for a traffic offense when the suspect's hands repeatedly moved towards his lap where the officer feared a weapon was hidden).

Based on these observations relating to Defendant's right pocket, Officer Vigil became concerned for "for the officers on the scene, for myself and for the Defendant as well and just everybody that was there. For safety reasons, you know. Firearms are very dangerous." April 4, 2019 Hr'g Tr. 19: 6-9. Officer Vigil then conducted a pat-down of Defendant's right jacket pocket. In conducting the pat-down, Officer Vigil grabbed the right side of Defendant's jacket with his left hand, and the center of Defendant's jacket with his right hand and lifted the right side of the jacket with both hands. Upon lifting, the right pocket was left hanging, and Officer Vigil observed a heavy object in the pocket "bounce." *Id.* at 71: 17-18. Officer Vigil then felt the outside of the right pocket with both hands and determined that the object in the pocket was a firearm. *Id.* at 20: 6-12. The Court finds that Officer Vigil's exclusive focus on Defendant's right pocket during the pat-down corroborates his testimony that he had reasonable articulable suspicion that there was a firearm in Defendant's right pocket.

In determining whether an officer has reasonable suspicion to conduct a pat-down following a lawful stop, the Court considers the totality of the circumstances. As the United States Circuit Court for the District of Columbia has explained, "[a]n officer on the beat does not encounter discrete, hermetically sealed facts. Rather, as we repeatedly have cautioned, the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them.... Hence, even though

13

a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors — especially when viewed through the eyes of an experienced officer — may." *United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (internal quotation marks omitted). Considering the totality of the evidence, the Court concludes that Officer Vigil had reasonable articulable suspicion to conduct a pat-down of Defendant's right pocket. The reasonableness of Officer Vigil's search is especially apparent given the recognized danger to officers when conducting traffic stops. *See, e.g., Wilson*, 519 U.S. at 413 (explaining that "traffic stops may be dangerous encounters" and recounting statistics of officers injured or killed during traffic stops); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (recognizing "the inordinate risk confronting an officer as he approaches a person seated in an automobile").

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the June 11, 2018 search and seizure of Defendant which resulted in the discovery of Defendant's loaded firearm was not in violation of his Fourth Amendment rights. Accordingly, the Court will DENY Defendant's Motion to Suppress. An appropriate Order accompanies this Memorandum Opinion.

 /s  
**COLLEEN KOLLAR-KOTELLY**  
United States District Judge